IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
7:11-CR-98-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| LEANDER SHERROD HANDS, | ) | |
| | ) | |
| Defendant. | ) | |

This case comes before the court on defendant's motion to suppress (D.E. 56), which includes an incorporated supporting memorandum. The government filed a memorandum in opposition (D.E. 62). The motion was referred to the undersigned for an evidentiary hearing and memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* Docket Entry of 25 Oct. 2011). For the reasons stated below, it will be recommended that defendant's motion be denied.

## PROCEDURAL BACKGROUND

On 10 August 2011, defendant was charged in a multi-defendant indictment (D.E. 1) with the following: conspiracy to possess with the intent to distribute and distribute a quantity of heroin from in or about January 2011 up to and including 15 February 2011 in violation of 21 U.S.C. § 846 (ct. 1); distribution of a quantity of heroin, and aiding and abetting the same, on or about 15 February 2011 in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (ct. 4); possession with intent to distribute a quantity of heroin and a quantity of cocaine base (*i.e.*, crack), and aiding and abetting the same, on or about 15 February 2011 in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (ct. 5); possession of firearms (*i.e.*, a Smith and Wesson .38 revolver and a .22 caliber Derringer handgun ("subject firearms")) in furtherance of a drug

trafficking offense on or about 15 February 2011 in violation of 18 U.S.C. § 924(c)(1) (ct. 6); and possession of firearms (*i.e.*, the subject firearms) by a convicted felon on or about 15 February 2011 in violation of 18 U.S.C. §§ 922(g)(1) and 924 (ct. 7).

On 6 October 2011, defendant filed the instant motion. It seeks suppression of all evidence taken during and derivative from a traffic stop of defendant on 15 February 2011, including the associated searches of his person, the vehicle he was driving, and a residence. Defendant does not challenge the subsequent searches themselves.

The undersigned conducted a hearing on the motion on 21 November 2011. (D.E. 69). At the hearing, the government presented the testimony of three detectives with the New Hanover County Sheriff's Office who were involved in the events in question: Patrick Sellers ("Sellers"), Anthony Bacon ("Bacon"), and Jonathan Hart ("Hart"). (Transcript of Hearing ("Tr.") (D.E. 78) 6:10-21; 93:6-21; 7-16). The court also admitted five exhibits offered by the government without objection by defendant, as follows: maps of the area where the events in question took place (Gov.'s Hrg. Exs. 1, 4); two photographs of the vehicle driven by defendant (Gov.'s Hrg. Exs. 5, 6); and the police surveillance video of a controlled buy of heroin on 15 February 2011 (Gov.'s Hrg. Ex. 7)[1] ("Video").[2] Defendant presented the testimony of Charles Livingston, a staff investigator with the Office of the Federal Public Defender. (Tr. 138:15-24). The court admitted 13 exhibits offered by defendant without objection by the government, as follows: color photographs of locations where the events in question took place (Def.'s Hrg.

---

[1] The compact disc containing the video of the 15 February 2011 controlled buy also contained a second video of what appears to show the 31 January 2011 controlled buy. However, because this second video was not offered or received into evidence at the hearing, the court has not considered it in the disposition of defendant's motion.

[2] All citations herein to the Video will be to the time of day in 24-hour or "military" format appearing in the lower right corner of the video image. However, the time that appears in the Video does not correspond with the time of day as represented in the testimony and investigative reports. Thus, while the court will reference this time stamp for the purpose of identifying specific portions of the video, the actual time that events occurred will be determined based on the other evidence in the record.

2

Exs. 1-9); a map of the area where the events occurred (Def.'s Hrg. Ex. 10); and the investigation reports of Sellers, Bacon, and Hart regarding the events (Def.'s Hrg. Exs. A,[3] 11, 12).

## FINDINGS OF FACT

After careful consideration of all the evidence of record on defendant's motion, the court makes the following findings of fact:

In January and February 2011, detectives in the vice and narcotics unit of the New Hanover County Sheriff's Office conducted three controlled buys of heroin through a confidential informant. The third controlled buy, on 15 February 2011, led to the traffic stop of defendant and the evidence derivative of the stop and associated searches that are the subject of his motion. The court will review the facts related to each controlled buy in turn.

**I.    31 January 2011 Controlled Buy**

In January 2011, the New Hanover County Sheriff's Office initiated an investigation of Juan Grady ("Grady") for dealing in controlled substances in Wilmington, North Carolina based on information it received from a confidential informant ("C.I."). (Tr. 9:1-16). The C.I. had assisted law enforcement on more than 20 prior occasions, including working in an undercover capacity to purchase controlled substances. (Tr. 9:20 to 10:8). He was familiar with the distribution of controlled substances in the New Hanover County area, including heroin. (Tr. 10:23 to 11:5). The C.I. had always provided accurate information to law enforcement, and his assistance resulted in arrests. (Tr. 10:9-22; 11:6-14). Sellers, who testified to the foregoing information about the C.I., was familiar with his reliability prior to 31 January 2011. (Tr. 11:6-14).

---

[3] Although defendant's other exhibits admitted during the hearing were labeled numerically, this exhibit was offered and admitted with the alphabetical designation that it was given by defendant when it was filed as an attachment to defendant's motion. (*See* D.E. 56-1).

3

Based on the information provided by the C.I., Sellers arranged to have the C.I. make a controlled purchase of heroin from Grady on 31 January 2011. (Tr. 11:18 to 13:14). Specifically, the C.I. placed a recorded telephone call to Grady and made arrangements to purchase a bundle[4] of heroin for $130.00. (Tr. 13:23 to 14:7). The C.I. was to pick up Grady in the C.I.'s car and drive to Taylor Homes, a housing complex on the north side of Wilmington, where the purchase would take place. (Tr. 14:20 to 15:11). Sellers also testified that Taylor Homes and the surrounding area are known to be an area where drug trafficking often occurs. (Tr. 27:23 to 28:4).

In accordance with common practice for controlled buys, Sellers directed other officers to conduct surveillance of the area around Taylor Homes prior to the purchase to help identify other persons that might be involved in the drug sale. (Tr. 15:17 to 16:14). Before the C.I. departed to pick up Grady, the C.I. was provided with an audio/video recording device. (Tr. 13:15-22; 16:17-20). Consistent with the Sheriff's Office's procedure for controlled drug purchases by an informant, an officer searched both the C.I.'s person and his vehicle before the transaction. (Tr. 13:2-14, 18-20; 17:19-25). The currency which was to be used to purchase the heroin was photocopied and provided to the C.I. (Tr. 13:15-22; 16:17-20; 17:19-25).

Sellers and another officer followed the C.I.'s car until the C.I. picked up Grady in the area of 11th Street, approximately five or six blocks from Taylor Homes. (Tr. 20:21 to 21:6). The C.I. then drove with Grady to the intersection of 6th Street and Nixon Street (Tr. 21:7-9), which borders the southeast corner of Taylor Homes[5] (*see* Gov't Exs. 1, 4). Sellers and the other

---

[4] A "bundle" is ten bags of heroin. (Tr. 14:8-10). Each bag contains a single dose of heroin, approximately 0.01 to 0.02 grams. (Tr. 31:19-22).

[5] The Taylor Homes complex, which is composed of four separate buildings, is bordered by 6th Street on the east, Nixon Street on the south, 5th Street on the west, and Howard Street on the north. (Gov't Exs. 1, 4). The complex is intersected by Taylor Street, which runs east to west through the middle of the complex. (*Id*.).

officers conducting surveillance in the area monitored the C.I.'s movement from a distance. (Tr. 21:10-23). After the C.I. parked near the 6th and Nixon intersection, the C.I. gave Grady the money for the purchase and Grady exited the vehicle and walked toward the Taylor Homes complex. (Tr. 23:16-18; 28:5-16; 29:8-13). Grady returned to the C.I.'s car after a few minutes with nine bags of heroin, which he gave to the C.I. (Tr. 29:1-13). After the C.I. dropped Grady off, the C.I. then met with Sellers. (Tr. 29:14-17). In accordance with standard procedures, the audio/video recording device was turned off, and the C.I. gave Sellers the purchased heroin. (Tr. 29:14-24). The C.I. and his vehicle were searched again. (Tr. 29:25 to 30:4). The purchased substance was field tested to confirm that it was heroin. (Tr. 30:8-13).

## II.  4 February 2011 Controlled Buy

On 4 February 2011, at around 3:00 p.m., the C.I. contacted Sellers and informed him that Grady was willing to sell the C.I. more heroin. (Tr. 34:6-11). After the C.I. arrived at the police station, the C.I. made a recorded telephone call to Grady, using the same telephone number to arrange the 31 January 2011 purchase, and made arrangements to purchase 11 bags of heroin, as opposed to 10, because the purchase on 31 January was short one bag. (Tr. 34:7 to 36:18).

In the same manner as in the 31 January purchase, the C.I. picked Grady up at 13th Street and Rankin Street and drove to the area of 6th Street and Nixon Street. (Tr. 37:11-19; 39:4-7; Gov't Ex. A at 1). After arriving at 6th and Nixon, Grady exited the C.I.'s vehicle and walked toward Taylor Homes. (Tr. 40:6-7). Sellers notified the officers conducting surveillance in the area by radio that the C.I. had parked at 6th and Nixon. (Tr. 39:4-7; 102:12-18). Just after this communication, Bacon, who was monitoring the Taylor Homes parking lot, saw two black males, one of whom fit the description of Grady, emerge from an open area between two of the

5

Taylor Homes buildings. (Tr. 102:12 to 103:19; Gov't Ex. B at 1). Directly behind the area from which they emerged is the intersection of 6th and Nixon where the C.I. had parked. (Tr. 102:12-18; Gov't Ex. B at 1). The two men went into the parking lot and entered a white Chrysler 300 ("Chrysler"). (Tr. 38:6 to 39:11; 103:15-21; Gov't Ex. B at 1). The time at which Bacon observed Grady enter the Chrysler in the Taylor Homes parking lot was consistent with his having walked to Taylor Homes from the C.I.'s car. (Tr. 40:6-12; 103:15-21).

During his pre-buy surveillance of Taylor Homes, Bacon had determined that the Chrysler was a rental car by running the license plates. (Tr. 38:20-22; 105:3-11). Sellers and Bacon each testified that based on their training and experience, rental cars are sometimes used by persons who are dealing large amounts of drugs. (Tr. 38:23-25; 95:7 to 97:3).

After staying in the Chrysler for approximately two minutes, both men exited the vehicle. (Tr. 39:6-11; 103:25 to 104:7; Gov't Ex. B at 1). The two men walked back in the direction from which they came. (Tr. 104:15-18). Shortly after observing the two men leave, Bacon heard Sellers radio that the transaction had taken place. (Tr. 104:21 to 105:2; Gov't Ex. B at 1). Grady returned to the C.I.'s car and gave him the 11 bags of heroin. (Tr. 40:13-16). After dropping Grady off, the C.I. met with the officers to complete the transfer of the heroin and conduct the required post-buy searches. (Tr. 41:9 to 42:11).

### III.   15 February 2011 Controlled Buy and Traffic Stop

At approximately 3:00 p.m. on 15 February 2011, the C.I. again contacted Sellers about making a purchase of heroin from Grady. (Tr. 43:17-22; Gov't Ex. A at 1). Arrangements were made for the C.I. to purchase 10 bags of heroin for the same price and in the same manner as in the prior transactions. (Tr. 43:17 to 45:17; Gov't Ex. A at 1).

As before, officers conducted surveillance in the area before and during the transaction. (Tr. 49:10-20; 54:23 to 55:6; Gov't Ex. A at 2). All of the officers involved communicated by mobile radio during the operation (Tr. 49:25 to 50:3), and Sellers radioed to other officers information received from the C.I. (*see* Tr. 61:1-4; 62:14-16). Bacon went to the same location in the Taylor Homes' parking lot where he had conducted surveillance during the 4 February 2011 controlled buy to determine if the same Chrysler would be involved in this transaction and to otherwise monitor the activities in the parking lot at the time of the transaction. (Tr. 49:14-17, 21-24; 50:4-7; Gov't Ex. B at 1). When he arrived at the Taylor Homes parking lot, he observed a gold Impala ("Impala") parked in the same parking space that the Chrysler had occupied on 4 February 2011. (Tr. 109:11-13; 110:3-4). Bacon ran the license plates of the Impala and discovered that it was also a rental car. (Tr. 109:13-25).

After the C.I. and his car were searched and he was provided with $140.00 in cash for the heroin purchase, the C.I. drove to the area of 13th Street and Rankin Street to pick up Grady. (Tr. 50:15-21; Gov't Ex. A at 1-2). Sellers, riding with another officer, followed the C.I. (Tr. 50:19-20; Gov't Ex. A at 2). At approximately 3:46 p.m., the C.I. picked up Grady. (Gov't Ex. A at 2). As Grady was entering the C.I.'s car, he was speaking to someone on his cell telephone who informed him that 6th Street and Brunswick Street would be the location for the purchase by Grady. (Video 16:50:04 to 16:50:40). After ending the call, Grady appeared to become confused about the location and appeared to call the person back to ask for more detailed information about the location. (Video 16:50:40 to 16:51:22).

Shortly after hearing over the radio that the C.I. and Grady were headed to the purchase location, Bacon observed a black male, who matched the physical description (*i.e.*, same height, build, and race) of the man he had seen with Grady on 4 February 2011, leave the parking lot of

Taylor Homes in the Impala. (Tr. 112:2-18; 113:2-8; Gov't Ex. B at 2). The Impala drove south on 5th Street in the direction of the intersection with Brunswick Street, which was then four blocks ahead. (Tr. 113:9-14). Bacon observed the Impala make a left turn approximately three or four blocks down the road and disappear from sight.[6] (Tr. 113:21-24).

As instructed by Grady, the C.I. drove to the area of 6th and Brunswick and parked. (Video 16:50:35 to 16:53:10). The C.I. gave Grady the $140.00, and Grady exited the vehicle. (Video 16:53:10-17; Tr. 54:8-19). The C.I. moved his car short distance after that. (Video 116:53:24-43). The C.I. then called Sellers and told him that he was at 6th Street and Brunswick Street,[7] identified a brown Ford Taurus ("Taurus") as the car with the heroin in it, and suggested that the officers move against this car, which was parked. (Video 16:53:30-51; Tr. 57:4 to 58:21; Gov't Ex. A at 2). The C.I. further stated that Grady was currently in the front seat of the Taurus with a white female. (Video 16:53:30-51; Tr. 57:4 to 58:21; Gov't Ex. A at 2). Approximately one minute later, apparently having observed one of the officers participating in the operation make a turn in the direction opposite to that where the Taurus was parked, the C.I. called Sellers again so that the officer could be redirected to the location of the Taurus. (Video 16:54:49 to 16:55:14).

---

[6] Defendant asserts that Bacon's report, which states that the Impala "drove on 5th Street towards Market Street before disappearing from view" (Gov't Ex. B at 2), is inconsistent with his testimony that the Impala turned left off of 5th Street before disappearing from view (Tr. 113:21-24). The court does not find these statements to be inconsistent because a car can "disappear from view" by turning onto a cross street.

[7] Sellers testified, erroneously, that the C.I. parked at 6th and Nixon. (Tr. 39:4-7; 51:10-13). Because that intersection is four blocks north of the 6th and Brunswick intersection (*see* Gov't Ex. 4), defendant argues that the C.I. could not have seen Grady in the Brunswick Street area. Through the investigator defendant called as a witness, defendant introduced street-level photographs of the 6th and Nixon Streets intersection to show that it was impossible to see all the way back to Brunswick Street. (Tr. 141:7-11; 142:11 to 143:15; Gov't Ex. 5 (street-level photograph taken from intersection of Brunswick and 6th Streets looking north toward Taylor Homes)). This argument and the supporting evidence is feckless because the Video clearly establishes the C.I. telling Sellers that he was at 6th and Brunswick. (Video 16:53:32-34). Similarly, defendant introduced photographs (Def.'s Exs. 2-5) showing that there was no parking lot at 6th and Brunswick to discredit the statement in Sellers' report that the C.I. told him he was parked there (Def.'s Ex. A at 2). In fact, though, the Video establishes that the C.I. did not say he was in a parking lot, thereby mooting this evidence. (Video 16:53: 32-34).

Less than one minute after the C.I.'s second call to Sellers, Grady returned to the C.I.'s car and provided the C.I. with the heroin and $10.00 in change. (Video 16:55:29 to 16:55:45). As Grady entered the car, he said to the C.I., "I had to get it from my cousin, man." (Video 16:55:26 to 16:55:31). The C.I. responded, "Oh, okay." (*Id.*). Grady then directed the C.I. to take him back to Rankin Street (Video 16:55:44), and the C.I. dropped him off approximately two and a half minutes later. (Video 16:58:00).

After the C.I. had dropped Grady off, approximately three minutes following Grady's delivery of the heroin to the C.I.,[8] he called Sellers back and told him that the heroin was in a Chevrolet Impala he described once as brown and once as tan. (Video 16:58:29-53; Tr. 16:58:25 to 16:59:06; Gov't Ex. A at 2). When Sellers asked the C.I. about the Taurus identified in the earlier call, the C.I. clarified that the woman in the Taurus had "copped" from Grady, meaning that she had purchased drugs from Grady.[9] (Video 16:58:53 to 16:59:01; Tr. 59:4-17). The C.I. also informed Sellers that he was headed back to the area of the transaction, around the intersection of 6th and Brunswick Streets, and saw that the Impala was at 5th and Brunswick Streets. (Video 16:58:42-47). He indicated to Sellers that he knew the identity of the driver of the Impala, and although the C.I. could not recall his name, he told Sellers that the driver had

---

[8] Although defendant asserts in his motion that the C.I. called Sellers to identify the Impala "some indeterminate time" after Grady delivered the heroin to the C.I. (Mot. 4), the Video affirmatively establishes that the call occurred approximately three minutes and ten seconds after the buy was complete. (*See* Video 16:55:29 to 16:58:36).

[9] Based on the C.I.'s initial identification of the Taurus as the vehicle involved in the heroin transaction, Sellers and another detective conducted a traffic stop of the Taurus. (Tr. 59: 20-22; 68:15-17). As stated by the C.I., the driver was a white female. (Tr. 59:22-23). After conducting the stop, which occurred in her driveway, the driver disclosed to the officers that she was in possession of marijuana. (Tr. 59: 23-24; 60:7-8). During the stop a white male emerged from the house and admitted to the officers that they had a lot more marijuana in the house. (Tr. 60:8-10). The marijuana in both the car and the house was turned over to the officers. (Tr. 60:10-12). It was during this traffic stop and investigation of the Taurus that the C.I. called Sellers to tell him that the Impala was the vehicle that had been involved in the heroin purchase. (Tr. 60:13-15). Sellers testified at the hearing that he prepared a separate report for the traffic stop of the Taurus and did not include a description of the stop in any of the reports that were prepared for the controlled heroin purchase by the C.I. (Tr. 81:15-21; 83:8-13). The government asserted that it had not seen, and was not even aware of, any report on the stop of the Taurus. (Tr. 83:19-24).

"just got out," clearly signifying that he had just been released from prison.[10] (Video 16:59:05-15; Tr. 62:1-8; Gov't Ex. A at 2).

At some point after hearing that the delivery to the C.I. had occurred, Bacon communicated over the radio that he had seen the Impala leaving Taylor Homes and driving in the direction of the buy location just prior to the time that the transaction took place. (Tr. 113:25 to 114:8). After hearing further radio discussion about an Impala among the other officers, Bacon communicated the license plate number of the Impala he had observed. (Tr. 114:9-15).

Sellers advised the other officers in the area to locate the Impala and conduct a traffic stop. (Tr. 61:1-4; 62:14-16). After he had returned to the area of the purchase, the C.I. called Sellers again to inform him that the Impala was driving down 6th Street, that he was currently about two blocks ahead of the Impala, and that the Impala was in front of one of the officers. (Video 16:59:37 to 17:00:23; Tr. 60:16 to 61:13). The C.I. called Sellers back approximately one minute later to tell Sellers that the driver of the Impala was known to carry a gun. (Video 17:01:27-41; Tr. 62:9-13).

Based on the information communicated by Sellers, Hart located the Impala traveling south on 6th Street near the intersection of Red Cross Street, which is approximately three blocks south of Brunswick Street. (Tr. 131:1-15). Hart was able to move closer to the Impala at 6th and Princess Streets and confirm that the license plate matched the one provided by Bacon. (Tr. 133:5-22; Gov't Ex. C at 1). After following it for a few blocks, Hart conducted a traffic stop of the Impala at Princess Street and 11th Street. (Tr. 134:18-22; Gov't Ex. C at 1). Hart identified

---

[10] Although, as defendant notes, Sellers states in his report that the C.I. also told him during this call that the driver was from the Swann Street area and had been in prison for several years (Gov't Ex. A at 2; Tr. 79:20-22), the Video shows that the C.I. did not make these statements. However, Sellers clarified that his report was prepared several days after defendant's arrest and that this additional information was not learned during the telephone call but during a later debriefing session with the C.I. (Tr. 79:23-25; 80:12-19). While the report does incorrectly indicate that this additional information was known to the police prior to the traffic stop, the court has not considered it in determining whether the facts known to the police prior to the stop were sufficient to permit it.

Case 7:11-cr-00098-FL   Document 104   Filed 06/12/12   Page 10 of 20

defendant as the driver. (Tr. 134:25 to 135:3). A subsequent consent search of the vehicle revealed a bag of crack cocaine, which resulted in defendant's arrest. (Gov't Ex. C at 2). During an additional search of defendant after his arrest, another officer found several bags of heroin and crack cocaine inside the front of his pants under his belt. (*Id*.).

## APPLICABLE LEGAL PRINCIPLES

The Fourth Amendment to the United States Constitution protects "against unreasonable searches and seizures." U.S. Const. amend. IV. While "not all personal intercourse between policemen and citizens involves 'seizures' of persons," when "a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16, 19 n.16 (1968). However, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30); *see also United States v. Williams*, No. 11-4414, 2011 WL 4866760, at *1 (4th Cir. 14 Oct. 2011). "Investigatory stops are also permissible if the officers act on a reasonable suspicion that the person stopped was involved in a completed crime." *United States v. Basey*, 816 F.2d 980, 988 (5th Cir. 1987).

"'The reasonable suspicion standard is an objective one, so we examine the facts within the knowledge of [the officers] to determine the presence or nonexistence of reasonable suspicion.'" *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011) (quoting *United States v. Digiovanni*, 650 F.3d 498, 511 (4th Cir. 2011); *see also United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004). "The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior, and it is measured by the totality of the circumstances." *Id.* (internal quotation marks and citations omitted). The reasonableness of

suspicion must be measured by what the officers knew before they conducted the stop. *See id.* (citing *Florida v. J.L.*, 529 U.S. 266, 271 (2000)); *see also Williams*, 2011 WL 4866760, at *1 ("Whether there is reasonable suspicion to justify the stop depends on the totality of the circumstances, including the information known to the officers and any reasonable inferences to be drawn at the time of the stop.").

Under the collective knowledge doctrine, "when an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself." *United States v. Massenburg*, 654 F.3d 480, 492 (4th Cir. 2011). The knowledge of the instructing officer is thereby substituted for the knowledge of the acting officer. *Id.* at 493. The doctrine does not permit the aggregation of bits and pieces of information from among myriad officers. *Id.* However, "'when a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically effected the arrest.'" *Id.* at 492-93 (quoting *United States v. Laughman*, 618 F.2d 1067, 1073 n.3 (4th Cir. 1980)).

"In cases where an informant's tip supplies part of the basis for reasonable suspicion, [the court] must ensure that the tip possesses sufficient indicia of reliability." *United States v. Perkins*, 363 F.3d 317, 323 (4th Cir. 2004) (citing *Florida v. J.L.*, 529 U.S. 266, 270 (2000)). Where the identity of the informant is known, a law enforcement officer "can judge the credibility of the tipster firsthand and thus confirm whether the tip is sufficiently reliable to support reasonable suspicion." *Id.* In contrast, "[w]here a tip is anonymous, it must be accompanied by some corroborative elements that establish the tip's reliability." *Id.*

When, as here, a defendant's motion to suppress challenges the constitutionality of a traffic stop, the government has the burden to prove by a preponderance of the evidence that the stop was lawful. *See United States v. Cauthen*, 669 F. Supp. 2d 629, 633 (M.D.N.C. 2009) (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 454-55 (1971)); *see also United States v. De La Fuente*, 548 F.2d 528, 533 (5th Cir. 1977). "[A]lthough the standard of proof 'is obviously less demanding than that for probable cause,' the government 'must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.'" *Powell*, 666 F.3d at 186 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). The Fourth Amendment requires the suppression of evidence that is the fruit of an unlawful stop. *United State*s *v. May*, No. 10-4053, 2011 WL 4379301, at *3 (4th Cir. 21 Sept. 2011) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).

## **ANALYSIS**

Defendant argues that the government has failed to show that the information the police had prior to stopping the Impala was sufficient to create reasonable suspicion for the stop and that the evidence obtained as a result of the stop is therefore inadmissible. The government responds that the facts known to the officers were sufficient to establish reasonable suspicion.[11] The court agrees with the government.

The information known to the police prior to the stop that gave rise to reasonable suspicion includes the following. First and most basically, because the police had already conducted two controlled buys with Grady, they were familiar with his particular method of operation with respect to heroin specifically. Moreover, this information was very current. Both

---

[11] In its written response to the motion, the government also makes the alternative argument that defendant does not have standing to challenge the search of the vehicle because it was a rented vehicle. (*See* Resp. 7). This argument is irrelevant, however, because defendant is not challenging the search of the vehicle, only the stop. In fact, according to the report of Hart, who conducted the stop and the initial search of both defendant and the vehicle, defendant consented to the searches. (*See* Gov't Ex. C at 2).

prior buys had occurred over the course of the preceding period of approximately two weeks. Police could reasonably anticipate that the controlled buy on 15 February would follow the same general pattern as the prior two buys.

In addition, there was strong evidence in the prior two controlled buys that Grady obtained heroin from someone operating from Taylor Homes. Taylor Homes was, of course, known to be an area with substantial drug trafficking. But more specifically, in both the prior two buys, Grady had the C.I. take him to 6th Street and Nixon Street, which borders Taylor Homes, where he exited the C.I.'s car and returned a short time later with the heroin. Even more significantly, in the 4 February transaction, a man matching Grady's description and another black male met in a rental car, the Chrysler, in the Taylor Homes parking lot where Grady apparently obtained the heroin. Sellers, of course, participated in both the prior controlled buys, and Bacon participated in the 4 February buy. Thus, the police, including Sellers in particular, could reasonably expect that in the 15 February transaction the heroin would come from the Taylor Homes area.

As the events on 15 February unfolded, they followed the same general pattern as those in the prior two buys. The C.I. called Grady; Grady had the C.I. pick him up; Grady then had the C.I. take him to another location and drop him off there; and Grady returned after a short period with the heroin. Conformance of these events with the pattern in the prior two buys tended to substantiate that the heroin would again come from Taylor Homes.

The presence of the Impala at Taylor Homes thus gave the police some basis to suspect its potential involvement in the transaction. Other evidence pointing specifically to the Impala included the following: it was a rental car, which was relevant because, as indicated, drug dealers often use rental cars in their drug trafficking activities; it was parked in precisely the

same parking space where the Chrysler in the 4 February transaction was located, suggesting the possibility that the person with the Chrysler was also the person with the Impala; a black male with the same general physical characteristics—height, build, and race—as the person who was observed entering the Chrysler on 4 February entered the Impala and did so at the time the transaction was in progress; and the Impala drove in the direction of the area of the transaction. While the record does not show that Bacon, who was conducting the surveillance at Taylor Homes, conveyed all this information to Sellers and the other officers, it does show that he did communicate that the Impala travelled in the direction of the transaction.

Of course, in addition to this information, Sellers and the other officers did have the benefit of information from the C.I. regarding the Impala. The police's prior experience with the C.I. alone gave them reason to credit the information he provided. As indicated, he had previously provided law enforcement information on more than 20 occasions, and the information was always accurate.

Based on his location, as he reported it, the C.I. was in the area where Grady was obtaining the heroin for the controlled buy. This fact substantiated that the C.I. would have been able to see the Impala and Grady's interaction with it.

Further, the C.I. provided unique identifying information relating to the Impala, not simply generic information. More particularly, in addition to identifying the model and color of the car, he stated that he recognized the driver and provided information about him. This fact tended to substantiate that he actually saw and was describing a particular vehicle.

The information the C.I. provided about the driver—that he was just released from prison and was known to carry firearms—supported the suspicion that the Impala was involved in criminal activity. Obviously, it would be unlawful for a convicted felon, whose rights had not

been restored, to possess a firearm. It would also be unlawful for a firearm to be used in furtherance of drug trafficking activity. *See Powell*, 666 F.3d at 188 (acknowledging that a person's possible involvement in prior criminal activity can be relevant in establishing reasonable suspicion).

After the Impala was on the move, the C.I. provided the police continuous real time information on its location. The fact that the C.I. recognized the driver of the Impala provided assurance that it was the same Impala the C.I. had seen previously. Using this information from the C.I., the police were themselves able to identify the Impala and begin pursuing it. The police were thereby able to verify the basic description of the vehicle provided by the C.I.

Further, the C.I. also confirmed to them that an officer was following the Impala. This information gave police further assurance that the vehicle they were following was, in fact, the one the C.I. had identified as the source of the heroin.

Moreover, the police determined that the license plate number of the Impala they were following was the same as that of the Impala that Bacon had previously observed in the Taylor Homes parking lot and communicated to the other officers. The police therefore knew that the Impala the C.I. identified and the Impala the police had observed at Taylor Homes were one and the same.

In sum, both the information from the C.I., which was received directly by Sellers and then conveyed by him to other officers, and the surveillance information from the Taylor Homes area that was communicated by Bacon to Sellers and the other officers, together with the information reviewed above that was known to Sellers and other officers prior to 15 February, established, at a minimum, reasonable suspicion that Grady obtained the heroin for the controlled

purchase by the C.I. from an Impala and definitively that the vehicle the police stopped was that Impala.

Defendant contends that the C.I.'s change in his identification of the car involved in the transaction—from a Ford Taurus with a white woman to a tan Chevrolet Impala with a recent releasee from prison he knew—undermines his reliability. But in his conversation with Sellers about the change, the C.I. provides an explanation for it without any hesitation. As discussed, he explained that the woman in the Taurus bought drugs from Grady. The police could reasonably conclude that the C.I. was initially mistaken about the car from which Grady obtained the heroin because, unknown to the C.I. beforehand, Grady first engaged in the drug transaction with the female in the Taurus and only then proceeded to the Impala.

In addition, defendant contends that reliance on the C.I.'s statements that the Impala was in the area of 6th and Brunswick Streets was improper because no police officers ever witnessed it there. There, of course, is no general requirement that each piece of information provided by a confidential informant be confirmed through eye witnessing by the police. No such corroboration was essential here specifically, in part, because of the indicia that the C.I. was reliable generally. Moreover, the location provided by the C.I. was consistent with the direction of travel of the Impala from Taylor Homes and the location at which the police first spotted the Impala after the transaction, only about three blocks south of 6th and Brunswick.

Defendant also complains that the C.I. never said to police that he saw Grady meeting with a black man in the Impala. But the C.I.'s statement that the Impala contained the heroin obviously signified that Grady had obtained the heroin from the Impala. And, of course, he indicated expressly that the driver was a man. Although the C.I. did not state the driver's race,

he subsequently pointed out the Impala itself to police, mooting the significance of the C.I.'s description to police of the driver as a means of identifying the Impala.

Defendant further argues that the decision by the government not to call the C.I. as a witness at the hearing leaves unresolved questions about what he told police and essentially confirms his unreliability. Needless to say, though, the determination on reasonable suspicion is based on the information known to the officer effecting the stop and the officer instructing him at the time of the stop. Defendant has not shown that supplementary information from the C.I. now about what he did and saw on 15 February but did not then convey to the police would be relevant. Significantly, the Video already provides a definitive record of what the C.I. told police.

Defendant additionally contends that the description of him obtained by the police from the 4 February transaction was too general to permit meaningful identification of him as the same person driving the Impala in the 15 February transaction. While that may be true, the recognition of the similarity by Bacon helped prompt him to continue his investigation of the Impala, which in turn led to additional evidence supporting reasonable suspicion. In any event, the match between the license plate number of the Impala at Taylor Homes and the license plate number of the Impala the police stopped resolved definitively the issue of whether the two Impalas were the same car, irrespective of the level of detail of the description of the driver. The identity of the driver did, of course, play a role in the C.I.'s identification of the Impala. But he did not require (and there is no evidence that he was privy to) the police description of defendant from the 4 February transaction because the C.I. already knew him.

Defendant also argues that the police could not reasonably deem the Impala they stopped to be the Impala observed by the C.I. because the C.I. described it as brown or tan whereas the

police in their reports describe it as gold.[12] (Def.'s Ex. A at 2; Def.'s Ex. 11 at 1) Having reviewed the photographs of the Impala (Gov't Exs. 5, 6), the court finds that these three color descriptions are not materially inconsistent.

Defendant further contends that discrepancies between certain information in police reports and other information of record—some of which are noted above—show that the police's statements regarding the events of 15 February are unreliable. The court disagrees. The purported discrepancies, to the extent they exist, do not show intentional wrongdoing and are not so extensive as to discredit the police's statements across the board. Rather, the discrepancies are a reflection of the complex and fast-moving nature of the events of 15 February, which involved a confidential informant, multiple officers in different locations, and multiple suspects, all of whom were mobile.

Defendant argues that this case is subject to the concern expressed by the Fourth Circuit in four recent cases "'about the inclination of the Government toward using whatever facts are present, no matter how innocent, as indicia of suspicious activity.'" *Powell*, 666 F.3d at 182-83 (quoting *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011) and referring as well to *Massenburg*, 654 F.3d at 482; *Digiovanni*, 650 F.3d at 512); (*see* Tr. 166:15 to 167:15). As can be seen, however, the government's case does not rest simply on the characterization of otherwise innocuous facts as suspicious. One reason is that, unlike in these other cases, the stop here was the product of an intensive investigation, which involved use of a confidential source and lengthy surveillance of suspects, as opposed to action taken in more spontaneous settings, where the opportunity to garner information was much more limited. *Powell*, 666 F.3d at 183-84 (frisk of a passenger for weapons during a routine traffic stop); *Massenburg*, 654 F.3d at 482-83

---

[12] Sellers stated in his report that the C.I. identified the Impala as gold (Def.'s Ex. A at 2). He acknowledged at the hearing, however, that the C.I. actually identified the Impala as brown or tan. (Tr. 58:25 to 59:22).

19

(frisk of a pedestrian while walking with three other men in an area near where gunfire was reported); *Digiovanni*, 650 F.3d at 501-04 (extensive questioning of driver during routine traffic stop); *Foster*, 634 F.3d at 245-46 (detention of parked car after observation of occupants).

Because the totality of the circumstances established reasonable suspicion to stop the Impala defendant was driving on 15 February, the stop did not violate the Fourth Amendment. Defendant's motion should accordingly be denied.

## CONCLUSION

For the foregoing reasons, the court concludes that the government has shown by a preponderance of the evidence that there was reasonable suspicion to support the stop of defendant's vehicle. It is therefore RECOMMENDED that defendant's motion to suppress (D.E. 56) be denied.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who have 14 days or such other period as the court may direct in which to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.

SO ORDERED, this the 11th day of June 2012.

James E. Gates
United States Magistrate Judge